UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

EDWARD JOSEPH WASHINGTON, JR.                 CIVIL ACTION

VERSUS                                        NO. 08-5209

MICHAEL J. ASTRUE, COMMISSIONER               SECTION "D" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Edward Joseph Washington, Jr., seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI, respectively, of the Act.  42 U.S.C. §§ 405(g), 423, 1381a.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

I.     PROCEDURAL HISTORY

Washington filed applications for SSI on November 2, 2004 and for DIB on December 22, 2004, alleging disability since January 3, 2003 and March 1, 2003, respectively, because of pain and shaking in his neck following a cervical spine fusion and back pain from a lumbar disc.  (Tr. 255-57, 281, 322-23, 601-03).  After his applications were denied, he requested a hearing before an Administrative Law Judge

("ALJ"), which was held on March 15, 2007. (Tr. 35-85). During the hearing, plaintiff amended his disability onset date to August 16, 2004. (Tr. 49-54, 152). On March 30, 2007, the ALJ issued a decision denying plaintiff's applications. (Tr. 152-59).

The Appeals Council granted plaintiff's request for review and, on July 24, 2007, remanded the matter to the ALJ for a new hearing and decision. The Appeals Council required the ALJ on remand to: (1) obtain additional evidence concerning plaintiff's degenerative disc disease of the cervical and lumbar spine; (2) consider further the opinions of two examining physicians, Dr. Camalyn W. Gaines and Dr. Bert R. Bratton, and explain the weight given to each; (3) if necessary, obtain evidence from a medical expert to clarify the nature and severity of claimant's impairments; (4) if applicable, further consider plaintiff's maximum residual functional capacity and provide an appropriate rationale; and (5) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Washington's occupational base. The Appeals Council directed the ALJ to consolidate these claims with subsequent claims for DIB and SSI that plaintiff had filed on April 9, 2007, and to issue a decision concerning all of them. (Tr. 224-26).

The ALJ held a second hearing on March 13, 2008 (Tr. 86-143) and denied plaintiff's applications on April 24, 2008. (Tr. 17-34). After the Appeals Council denied

review on October 23, 2008 (Tr. 7-9), the ALJ's decision became the final decision of

the Commissioner for purposes of this court's review.

II.    STATEMENT OF ISSUE ON APPEAL

Plaintiff contends that the ALJ made the following error:

A.    The ALJ erred by failing to give controlling weight to the opinion of plaintiff's treating physician as required by 20 C.F.R. § 404.1527(d) and Social Security Ruling 96-2p.

III.    ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following relevant findings:

1.    Plaintiff has severe impairments consisting of status post-cervical discectomy and fusion in 2001, degenerative changes at L3-4 and L5-S1 of the lumbar spine and disc bulging at L5-S1.

2.    Although his impairments do limit his activities, the clinical findings do not disclose any organic abnormality capable of producing pain and limitation of the incapacitating proportions alleged. Plaintiff's allegations and subjective symptoms are not fully credible.

3.    Washington has the residual functional capacity to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for 2 hours, 20 to 45 minutes at a time, in an 8-hour work day. He can sit up to 6 hours, 1 hour at a time, in an 8-hour work day. He requires the ability to alternate sitting and standing. He may occasionally need to use a cane. He is restricted from extreme heat/cold, unprotected heights, vibrations and overhead work.

4.    He cannot perform his past relevant work as a coach cleaner, fast food worker and security person.

5.      Considering plaintiff's age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that he can perform, including telemarketer, dispatcher and information clerk, all of which are sedentary.

(Tr. 19, 23, 28, 31-33).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. Perez, 415 F.3d at 461. Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2008). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920;

---

[1]The relevant law and regulations governing a claim for DIB are identical to those governing a claim for SSI. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994); Hollis v. Bowen, 837 F.2d 1378, 1382 n.3 (5th Cir. 1988).

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[2]  The five-step

inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If

he successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing.  When the Commissioner shows that the claimant is

capable of engaging in alternative employment, the burden of proof shifts back to the

claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

At the first hearing on March 15, 2007, plaintiff testified that he was 47 years old and had finished the twelfth grade. He said he had completed vocational courses in both welding and certified nursing assistant, but he no longer has his certification. He stated that he has been married for 18 years and has five-year-old twin children who live with him. (Tr. 39-41).

Washington testified that he last worked in 1999 cleaning train cars for Amtrak as a coach cleaner. He said he held that job for one and one-half to two years, and that he stopped working because he was injured on the job. Plaintiff stated that he worked as a security guard in an apartment complex from 1997 to 1999. (Tr. 42-43). He said that the security job involved walking around the complex every two hours and checking people in at the front desk. (Tr. 43-45). Plaintiff testified that, before the security job, he was an orderly in a nursing home, grooming, bathing and putting patients to bed. He stated that he also worked as a fry cook at Kentucky Fried Chicken from 1995 to 1996. He said that he worked part-time from 1990 to 1996 for a private company, sitting with

elderly persons in their homes. (Tr. 46-47). He said that, while working for this company, he read to and helped a blind, double amputee to move when necessary, such as bathing the patient and going to the doctor with him, but that he did not cook, run errands or clean house for the patient. (Tr. 47).

Plaintiff said that, after he was injured while working for Amtrak, he received payment for medical care and a type of federal worker's compensation for about one and one-half years and that he settled with Amtrak in 2001 for $500,000. He stated that he received about $210,000 after attorney's fees and taxes, and that he and his wife bought a house and a vehicle with that money. (Tr. 48-49).

Washington testified that he had neck surgery in 2001. He said that he filed for and received a lump-sum payment for a closed period of Social Security disability from about 1999 through about 2002. (Tr. 50-51). He stated that all of his records from that time period were lost during Hurricane Katrina. He testified that he had surgery because the pain in his neck became excruciating. He said he accepted a closed period of disability because he thought he might want to go back to work.

The ALJ then advised plaintiff and his counsel that another ALJ had issued a decision granting a closed period of disability on July 30, 2004. (Tr. 51-52). Plaintiff's attorney stated that he did not wish to reopen that decision. He amended the alleged disability onset date in the instant case to August 16, 2004. (Tr. 53-54).

Washington testified that he chose the closed period of disability because his neck had improved in 2004, but he began to notice that his back hurt and that he was unable to get out of bed when he did things around the house and tried to exercise. He said his current disability is based on his back problems. (Tr. 54-55). He stated that one night in 2003 (which was during the closed period of disability), he stood up, lost all feeling from the waist down and fell to the ground. He said his back problems became a major issue when he had to stop doing things around the house and when he fell in 2003. (Tr. 55-56).

Plaintiff stated that, after he settled with Amtrak, he saw a doctor for a second opinion. He said this doctor told him that he needed surgery, but he lost the papers and just "threw it off." He testified that he might have seen this doctor in 2004. He stated that he filed his current claim in November 2004 after he went to the emergency room at Charity Hospital, where he was referred to Dr. Keith Winfred. He said Dr. Winfred was very concerned about plaintiff losing control of his bowels and urine. (Tr. 56-57).

The ALJ noted that one of plaintiff's medical records dated August 31, 2005 from Earl K. Long Hospital in Baton Rouge included reference to an episode of bowel incontinence that reportedly started two months earlier, and noted that plaintiff was walking with a cane. Washington testified that his incontinence had not gone away and has been continuous since that date. He said it occurs about once a week or once every

other week, while he is sleeping, both at night and during the day. (Tr. 57-58). He stated that the entire sofa had to be cleaned when it happened once while he was asleep on the sofa and that, after it happens, he usually gets into the tub to wash himself. (Tr. 58-59). He testified that he was scheduled to see a specialist at LSU[3] in August 2005, but he never saw the specialist because Hurricane Katrina hit. He stated that his problems with incontinence started around that time and that the doctor he saw did not tell him why or what caused it. (Tr. 59).

Washington said the same doctor told him that it would be best for him to walk with a cane. He testified that, in August 2005, he was able to stand or walk for 35 to 45 minutes. He stated that he can only stand now for about two minutes before the pain starts, but that he does not have to sit down immediately. (Tr. 60). He said he can stand for about two hours, but he spends most of his day lying down or sitting. He stated that, for the past three years, he has been unable to sleep at night and he takes two-hour naps during the day.

Plaintiff testified that he did not watch his children during the day, even when they were very young, because his wife did not work then. (Tr. 61). He said his wife now works two days per week and is on call two days per week. He stated that he does minor

_____

[3]This is a reference to the Louisiana State University Health Sciences Center Medical Center of Louisiana at New Orleans (sometimes referred to herein as the "Medical Center of Louisiana").

repairs around the house, like replacing a screw, but he has not cut the lawn for two to three years. (Tr. 62). He said he used to go to church weekly, but only goes about once a month now, even though he is an ordained elder. (Tr. 61-62).

Washington stated that his condition has worsened since November 2004. He said he tried to do more to help his wife in 2004, including cutting the grass, but he was not able to do that now. (Tr. 67-68). He testified that he used to cut the grass about every three weeks, which took about 30 minutes with a push mower. He said he used a cane in 2003 and 2004. (Tr. 68). He stated that he no longer went up the stairs to his second-floor bedroom in 2004, but he slept downstairs. He said he did not have to use a cane when he was indoors during 2004, but he now uses it when he is at home and when he goes out, because he does not know when he might fall and the cane makes him feel comfortable. Plaintiff stated that he uses the cane more now than he did in 2004 so that he can stand with better balance. He testified that he no longer drives and that he sits the entire time when he goes to church. He said he started using the cane when Dr. Winfred was concerned about him falling down, which was in 2003 or early 2004. (Tr. 69-71).

Plaintiff testified that he has been taking medication for depression since 2003. (Tr. 71). He said he is irritable, does not want to be around anyone, cannot stand the sunlight and prefers to be in the dark. He stated that he is agitated, cannot concentrate and does not like his children seeing him like that. He said his depressive symptoms

began when he saw his wife working more hours and he could not help her, because he was raised to be a man and he promised to take care of his wife. (Tr. 72).

Washington testified that he could not work in November 2004 because his sleep pattern at night was broken. He said he sleeps about two hours during the day, and then has to get up, stretch and try to find a comfortable position. (Tr. 72-73). He said he cannot go without sleeping in the daytime because drowsiness overpowers him and that he cannot sleep at night. (Tr. 73).

Plaintiff stated that he was unable to work in November 2004 because the pain in his back worsened. He said the pain shoots up and down his legs and he also has numbness. He testified that he can sit for 35 to 45 minutes, then he needs to get up to stretch and walk, and he props a pillow behind his back to sit up or lies down. He said he cannot lie on his stomach. He said he takes his irritation out on his wife. (Tr. 74). He said he lies down 95% of the time, trying to relieve pain in his back and numbness and pain in his legs. He stated that, in 2004, he did not want the blinds opened, did not want to be with anybody and cried a lot, trying to figure out what he could do to take care of his family. (Tr. 75). He said he could not do anything physically and that his wife did all the cooking and cleaning at that time. (Tr. 75-76).

Washington testified that he has been told that he needs an operation. He stated that neither he nor his wife has medical or life insurance. He said he was first told that

he needed back surgery in 1999 by Dr. Rauschwerk, who performed his neck surgery. He said he did not have back surgery at that time because he assumed that he would be able to go back to work, but he wants back surgery now. (Tr. 76). He stated that Dr. Burk[4] and Dr. Holt have recently told him that he needs surgery. (Tr. 77).

At the second hearing on March 13, 2008, plaintiff's attorney and the ALJ agreed that they would address only the issues raised by the remand order and would not repeat the testimony that had been taken at the first hearing. However, the ALJ told plaintiff's attorney that he could revisit the evidence to the extent he felt necessary. (Tr. 91).

A medical expert, Dr. Kweli Amusa, testified by telephone.[5] She stated that she had reviewed the objective medical evidence. The ALJ noted that assessment of the prior subjective testimony was reserved to the court. (Tr. 92). Dr. Amusa agreed to listen to the testimony of Dr. Bratton before she testified. (Tr. 93).

Dr. Bratton testified that he began seeing Washington on February 6, 2007 and that he continues to treat plaintiff with medication, which he last prescribed in January 2008. He stated that he has never performed surgery on Washington. He testified that he discontinued the surgical part of his practice in 2005 because of a medical problem

---

[4]The transcriptionist indicated this was phonetic spelling. Plaintiff was most likely referring to Dr. <u>Bert</u> Bratton.

[5]The transcriptionist reported some of Dr. Amusa's testimony as inaudible.

that he developed. (Tr. 94-95). He said he now does consulting work only and refers his patients to a surgeon if they need surgery.

Dr. Bratton stated that he sees Washington once or twice a week because they go to the same church and that plaintiff attends a Bible study at Dr. Bratton's house on Monday nights. He testified that he sees plaintiff anytime that Washington needs more medication or wants to give him some information. He stated that plaintiff does not come to his office because they see each other so frequently in this way. (Tr. 95).

Upon cross-examination by plaintiff's attorney, Dr. Bratton said he graduated from LSU Medical School in 1972, completed a neurosurgical residency and began practicing in New Orleans in 1979. He then moved his practice to Slidell, Louisiana, and became board certified in neurosurgery in 1983. He stated that he stopped performing surgery in January 2005 because of a cervical disc problem. He testified that he has seen more than 10,000 patients, about 80% of whom had spine problems, and that the vast majority of patients on whom he performed surgery had neck and low back problems. He stated that he is very familiar with the problems that Washington has and that he had reviewed "most–if not all–of the medical evidence that [plaintiff's attorney] provided to [him] that is of record in this file." (Tr. 96).

Dr. Bratton testified that the medical records show that plaintiff made multiple visits to the Medical Center of Louisiana emergency room, beginning on August 16,

2004, and culminating in an MRI scan in November 2004, which documented lumbar stenosis.[6]  He stated that he continues to see Washington for lumbar stenosis and that a repeat MRI scan in February 2007 showed the same findings.  Dr. Bratton said that, based on the medical records, he would date the onset of plaintiff's symptoms of the same degree to August 2004.  (Tr. 98).  He stated that the radiologist's interpretation of the 2007 MRI scan demonstrated a similar configuration to the MRI scan in 2004 and basically showed the same ongoing problem.

Dr. Bratton found credible objective evidence to support plaintiff's allegations of severe pain.  He said the MRI scan shows that Washington has bilateral foraminal stenosis.  He explained that the neural foramen is the opening in the side of the spine through which the nerves pass and that a narrowing of this opening is called stenosis.  He testified that the MRI also showed some bulging and degeneration of the disc and thickening of the nerve at that level.  He stated that a nerve thickens because it is compressed and swollen and has scar tissue.  (Tr. 99).  He testified that the February 2007 lumbar MRI is objective evidence of what is commonly called a pinched nerve, which fits plaintiff's symptomatology.  (Tr. 99-100).

---

[6]Stenosis is an abnormal narrowing of a duct or canal.  Dorland's Illustrated Medical Dictionary 1698 (29th ed. 2000) (hereinafter "Dorland's").

Dr. Bratton noted that plaintiff had presented to the emergency room at Charity Hospital on several occasions in 2004 and had been referred to the neurosurgery clinic for his back problem, where he received a diagnosis of lumbar disc syndrome with radiculopathy. He explained that radiculopathy means a pinched nerve, or leg symptoms from a pinched nerve, which was well documented back to 2004.

Dr. Bratton said he knows that plaintiff has no medical insurance, cannot afford treatment and is unable to get the testing that Dr. Bratton thought was necessary for a full evaluation. He stated that he tried to order an MRI scan from Charity, and also requested that the hospital perform an updated cervical MRI when they did the lumbar scan, but his requests were ignored. (Tr. 100). He testified that he does not think that plaintiff has been thoroughly evaluated for his current and continuing symptoms. (Tr. 100-01).

Dr. Bratton agreed with the Charity Hospital emergency room diagnosis dated November 19, 2004, that Washington had post-traumatic neck and back pain with cervical and lumbar disc herniations superimposed on pre-existing cervical and lumbar spondylosis.[7] He stated that plaintiff's symptoms of bilateral upper and lower extremity numbness for the past four months and his refusal to move his extremities when the examining doctor tried to test his motor skills, as reported on a Charity Hospital record

---

[7]Spondylosis means either ankylosis (immobility and consolidation) of a vertebral joint, or is a general term for degenerative spinal changes due to osteoarthritis. Id. at 91, 1684.

dated December 13, 2004, were consistent with his own findings and with the objective diagnostic testing. (Tr. 101).

Based on his review of the record, Dr. Bratton agreed with a letter dated December 23, 2004 by nurse practitioner Vidya Mandhare and Dr. Waldo Holt, stating that Washington should be strongly considered for disability due to chronic and severe pain, depression, episodes of losing balance and falling down, which required the use of a cane, and that plaintiff was unable to work. (Tr. 101-02). When plaintiff's attorney read aloud the findings of the consultative examiner, Dr. Gaines, in March 2005 (Tr. 407-10), Dr. Bratton stated that her objective findings were supported by the November 2004 MRI results, which showed the problem that would cause exactly the symptoms that Dr. Gaines described. (Tr. 103-04). Dr. Bratton testified that the February 2007 scan showed the same thing and that it was "very consistent with" Dr. Gaines's findings. He stated that the November 2004 scan, which showed the source of the problem, and Dr. Gaines's findings in March 2005 were "very consistent with" plaintiff's complaints in August 2004, and that the results from that entire period showed "the ongoing continuum of his problem." (Tr. 104).

Dr. Bratton testified that he does not think Washington will be able to return to the workforce. He said he does not like to say it because he has been very conservative in his 25 years of practice in declaring people totally and permanently disabled. However,

he stated that plaintiff had a combination of a three-level cervical fusion, residual symptoms, significant lumbar stenosis and nerve damage, which is "strongly suggested by" thickening of the nerve, although he said the nerve damage has not yet been adequately studied.

Dr. Bratton testified that Washington's specific disabilities of the neck and low back prevent Washington from performing even sedentary work. He explained that the neck "comes into play" with "sitting and doing desk work," while "the low back comes into play" with "sitting for long periods." He opined that these two specific spinal problems render plaintiff permanently and totally disabled from working. (Tr. 105).

Dr. Bratton stated that it is typical that Washington would have to take frequent rest breaks to lie down throughout the day, particularly now, because he has not been treated for his lumbar condition. He opined that plaintiff will definitely need surgery for his lower back and that, even with surgery, the MRI scan "strongly suggested" that "he still has the potential for significant residual symptoms, because the thickened nerve root is probably going to have some permanent damage." He testified that surgery would probably alleviate some of Washington's symptoms, but would not leave him pain-free.

Dr. Bratton opined that plaintiff will need to alternate positions and cannot sit, stand, bend or do desk work. He said Washington cannot do much on a 40-hour work week schedule. He stated that "it's very probable that even with a good result from

surgery, Mr. Washington will have to continue to take pain medication, which can affect people's ability to work," from both a mental and a safety standpoint. He gave his own experience as an example: he gave up his surgical practice because he did not feel comfortable taking pain medication and performing surgery. (Tr. 106). Dr. Bratton further stated that "sedentary work would not harm Mr. Washington, but based on the medical information I have, there is no reason to think that he would be successful holding down a good work schedule. He would miss work, he would have to use medication while working, and that to me is unacceptable." He repeated that he did not think that Washington could sustain an acceptable work performance. (Tr. 107).

In response to a question by the ALJ, Dr. Bratton testified that he would not be surprised if plaintiff had said, when he applied for benefits, that he could walk a block at a time, and could lift 30 pounds, and then would have to stay home after that. (Tr. 107). Plaintiff's attorney asked the ALJ to identify the exhibit in which plaintiff had stated that he could lift 30 pounds.

The ALJ noted that Washington had stated, when he applied for benefits, that he could not walk more than one block, he used a cane and "'I picked up 30 pounds and keep and stay home.'"[8] When the ALJ asked plaintiff whether that had changed since

---

[8]Plaintiff made this statement on Exhibit 13E, a Function Report that he completed on May 15, 2007, in conjunction with his renewed application for benefits filed in April 2007. In response to the question, "Have you noticed any unusual behavior or fears?" he checked "yes," and explained his answer

he applied, Washington responded, "Exactly." The ALJ asked, "When did it change from that lifting 30 pounds, and walking about a block at a time?" Plaintiff said: "Well, I think the 30 pounds was just me saying something quick, because it's a lot of stress when you go . . . file for your disability. It's a thousand questions. . . . I don't know why I said 30 pounds." (Tr. 124-25). He stated that he has not worked since he filed for disability.

Upon questioning by his attorney, Washington said that he could probably lift 30 pounds in an emergency to save his life or his child's life, but that he could not now do it occasionally throughout a day for one-third of the day. (Tr. 125-26). The ALJ asked again when that had changed and become more restrictive. Washington answered that he went to the emergency room in August 2004 when he lost all feeling below the waist, urinated on himself, had bowel incontinence and fell down.

Upon further questioning by his attorney, plaintiff testified that he always puts a pillow behind his back when he sits. (Tr. 126). He said he can sit for an hour on some days, but cannot sit that long on other days. (Tr. 126-27). He stated that he has days

---

by stating: "I picked up 30 pound [sic], and keep and stay at home." (Tr. 355). The medical records reveal that Washington gained 41 pounds between February 16, 2006 and February 22, 2007, when he had his highest recorded weight. (Tr. 424, 519). His statement that he "picked up 30 pound[s]" obviously referred to his "unusual" weight gain, not to the amount of weight he could lift. I find, however, that this error by the ALJ is harmless and would not change the outcome if it were corrected, given the substantial evidence in support of the ALJ's residual functional capacity findings. Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007).

when he feels that he cannot leave the house. He said there was a time when he did not want to see the sun shine and he just stayed inside, which occurred in 2004. He testified that he now leaves his house about twice a week and stays at home the other five days.

Washington stated that he can stand between 20 and 45 minutes, but it varies, and sometimes he can stand for less than 20 minutes. (Tr. 127). He said he cannot alternate between sitting and standing for six hours, but could sit for about one and one-half hours on a comfortable chair. (Tr. 127-28). He testified that, after one and one-half hours of sitting, he probably would be groggy and short-tempered because of his medications. He stated that he sleeps between three and four hours during the daytime six out of seven days because he might not sleep at all during the night or might not fall asleep until 2:00 or 3:00 a.m. (Tr. 128). He said his sleeplessness is caused by pain. (Tr. 128-29).

Plaintiff testified that his statement in Exhibit 3E (Tr. 298-99) in November 2004 that he cannot sit up and he lies down 95% of the time is correct. He confirmed as "correct to date" his statements in that same exhibit that he takes medicine in the morning, has problems sleeping at night because of pain, and has upper extremity numbness and lower extremity pain. He also stated that he is very depressed, no longer drives, has problems writing because of hand weakness and cannot hold his head down longer than about six minutes, so he has difficulty reading. He said his wife handles the bills. He testified that he has shaking in his head and stiffness in his neck. (Tr. 129-30).

Washington stated that he used to attend church about once a week, but could not sit longer than 30 minutes and had to leave church services early. He said there was a time when he could not go to church at all. He testified that he cannot play with his children the way that he would like and that he has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling and climbing. He said he also has increased forgetfulness and problems with following instructions. (Tr. 130).

C.    Medical Expert Testimony

Based on her review of the objective evidence, Dr. Amusa testified that plaintiff does not meet any of the listings. She stated that "Dr. Bratton did an excellent job" summarizing the findings in the record, but she noted some discrepancies in the physical examination done by Dr. Gaines[9] on March 10, 2005 (Tr. 407-10), and the more recent consultative examination on July 10, 2007 by Dr. Miljana Mandich (Tr. 549-54). Dr. Amusa noted that the July 2007 report stated that plaintiff ambulated slowly without a limp. However, his gait was described as antalgic[10] in 2005 and he had a cane with him to use in case his legs "went to sleep." (Tr. 110-11). She said he stated that his leg goes

---

[9]Dr. Amusa incorrectly stated that the examination was performed by Dr. Carroll. The report is on letterhead headed by the name of Gary F. Carroll, M.D., but there are three other doctors listed in smaller type below Dr. Carroll's name, including that of Dr. Gaines. Dr. Gaines clearly signed the report. (Tr. 407-10).

[10]An antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures (as in hip injuries), characterized by a very short stance phase." Dorland's at 721.

to sleep if he sits for a long period of time. She noted that Dr. Mandich reported that plaintiff was able to walk, sit on and get up from a chair, and get on and off the examining table without using a cane. She said Dr. Mandich observed that Washington had decreased range of motion in his back and neck, and could squat only halfway down. She noted, however, that plaintiff's straight leg raising test was negative, he had no atrophy and his muscle tone and strength were normal in Dr. Mandich's report. (Tr. 111). In addition, Dr. Mandich observed no decrease in sensitivity to pinprick, which Dr. Amusa remarked was a discrepancy from the 2005 examination report.

Noting that most studies have been of plaintiff's lumbar, rather than his cervical, spine, Dr. Amusa stated that a July 10, 2007 lumbar x-ray showed marked narrowing at L5-S1 and degenerative changes consistent with the previous CT scan and MRI results.[11] She said she agreed with Dr. Bratton's testimony concerning the radiological studies, namely, the CT scan on November 9, 2005,[12] the MRI on November 1, 2004 and the repeat MRI on February 27, 2007, and that the studies consistently showed degenerative changes in the lumbar spine.[13] (Tr. 112-13). Dr. Amusa also agreed with Dr. Bratton that

---

[11]A portion of this sentence was inaudible.

[12]The November 9, 2005 date may have been a transcription error, or perhaps Dr. Amusa misspoke. The only CT scans in the record are dated December 9, 2005. (Tr. 494-95).

[13]A portion of this sentence was inaudible.

plaintiff has mild bilateral foraminal stenosis, which might give him increased pain and numbness.[14]

When asked what work limitations she would place on Washington, Dr. Amusa testified that she understands that his pain fluctuates and that he might have more pain on some days than on others. Based on the evidence she had reviewed, "particularly the (INAUDIBLE) exam," she said she would expect him to have some difficulty with lifting. She stated that he could not lift more than 20 pounds and could lift only up to the waist level, with no lifting overhead. (Tr. 113). She opined that he would have to be able to use a handheld device when needed and must be able to alternate sitting and standing to relieve his discomfort. (Tr. 113-14). Dr. Amusa testified that plaintiff could stand and walk at least two hours and sit at least six hours in a day, with the opportunity to change positions as needed for comfort or to hold on to a cane. (Tr. 114). She stated that the amount of time he could sit at a work site at any one time before taking a break to stand would be very subjective. She could not say how long he could sit without a break. She noted that times can vary for people with plaintiff's condition, because on some days they might be able to do something a little longer than on other days.

---

[14]A portion of this sentence was inaudible.

Dr. Amusa stated that Washington's degenerative changes would make him uncomfortable in extremes of cold, heat or humidity, and that she would advise against concentrated exposure to vibration. (Tr. 115). She opined that he should not be working at heights or around hazardous machinery because of the narcotic medications he takes. (Tr. 115-16). Further, she would restrict him from working overhead or lifting his arms overhead because of his cervical disc disease.[15]

On cross-examination by plaintiff's attorney, Dr. Amusa testified that it was possible that Dr. Mandich might not have noticed the muscle weakness, atrophy or decreased sensation to pinprick noted by previous examiners. (Tr. 116-17).[16] She said she did not see how Dr. Mandich could have missed an antalgic gait. Asked whether she would rely on this one report if it was somewhat inconsistent with the majority of the other evidence in the record, Dr. Amusa stated that she certainly would rely on the majority of the evidence. However, she noted that the examinations of plaintiff in the emergency room and the clinic were not very thorough, particularly as to muscle strength or problems with sensation. She said she had no idea how long Dr. Mandich spent

---

[15]Part of this sentence, which perhaps included additional restrictions based on plaintiff's cervical disc disease, was inaudible.

[16]Part of this sentence related to range of motion was otherwise inaudible.

evaluating Washington. (Tr. 117). She stated that she had not reviewed any of the self-reported forms submitted by plaintiff with his application for benefits. (Tr. 117-19).

When asked by plaintiff's attorney whether she agreed with Dr. Bratton's opinion regarding plaintiff's "needing to take breaks throughout the day, to lie down, or possibly missing days of work due to exacerbations of pain," Dr. Amusa said that she agreed. (Tr. 120). She clarified that plaintiff must be allowed to change positions, but she could not say whether, for him in particular, that would mean lying down. (Tr. 120-21). She stated that she knows that people with his type of impairment generally need to change their positions to get comfortable, but "it would be hard to say from the evidence that he actually has to [lie] down for any given period of time." (Tr. 121).

Dr. Amusa testified that Washington needs to be able to alternate sitting and standing at will. She said she would leave it to a vocational expert to state whether there were any jobs that he could perform with that restriction. She stated that she is not a surgeon and has never performed surgery. (Tr. 123). She testified that she is board certified in internal medicine and emergency medicine. (Tr. 124).

D.   Vocational Expert Testimony

A vocational expert, Karen Harrison, testified at the first hearing. The ALJ posed a hypothetical of a 47-year-old claimant with plaintiff's education who must avoid prolonged, repetitive and continuous neck flexing and rotation; balancing; climbing

ladders, ropes and scaffolds; working at unprotected heights; and working around dangerous, moving machinery. The hypothetical person could lift and carry up to 20 pounds occasionally and 10 pounds frequently, could stand and walk for only two to three hours and could sit for the majority of the day. Harrison testified that such a claimant could perform plaintiff's past relevant work as a security guard, provided that Washington did not actually walk more than two hours during a shift. Plaintiff then testified that he did not walk for a total of an hour during the tours that he made every two hours, but he spent the majority of time standing while he was checking people in at the apartment complex. (Tr. 78-79).

The ALJ modified the hypothetical so that the claimant had to use a cane occasionally, but not for short distances. The vocational expert testified that such a person would not be able to work as a security guard, but would be able to work in sedentary jobs such as information clerk, customer service and cashier, which are available in significant numbers in the statewide and national economies. (Tr. 79-80).

The ALJ asked whether a person who would have to miss work for one to two days per month because of his health issues could hold a job. Harrison stated that the industry standard is that a person could usually sustain employment if he missed between one and two days of work per month, but would not be able to sustain employment if he

missed more than two days per month on a repetitive basis, even if the person had a doctor's excuse. (Tr. 81).

The ALJ then modified the hypothetical so that the claimant would miss less than two days of work per month. He asked whether the person could take more breaks than the two fifteen-minute breaks and one lunch break that employers usually allow, because of medication side effects, fatigue or inability to concentrate, or because he had to lie down 95% of the time. Harrison testified that such an individual would not be able to hold a job. (Tr. 81-82).

Upon cross-examination, plaintiff's attorney posed a hypothetical of a person with the same background and limitations as the ALJ's first hypothetical who is limited to sedentary work with the need to stand at will, but is unable to stand or walk for longer than 30 minutes at a time, up to two hours total in an eight-hour day. This hypothetical claimant could lift 20 pounds occasionally and 10 pounds frequently, but only from the waist level up; could not use foot controls; and would need a cane to stand or ambulate. This person also has moderate restrictions in his ability to concentrate and maintain attention and is able to deal with the general public only occasionally.

Harrison testified that such a person would not be able to perform any of plaintiff's past relevant work. She said he would also be unable to perform any of the sedentary

jobs she previously mentioned because of the limitation against more than occasional public contact and the need to alternate positions at will. (Tr. 83-84).

Another vocational expert, John Yent, testified at the second hearing. The ALJ posed a hypothetical of a 48-year-old individual with a high school education and plaintiff's past relevant work, who can lift and carry 20 pounds occasionally and 10 pounds frequently, and must use a handheld device, such as a cane, occasionally. The hypothetical person must avoid vibrations and extremes of cold and heat; cannot work overhead, at unprotected heights or around dangerous moving machinery; and cannot balance or climb ladders, ropes or scaffolds. (Tr. 131). This person could stand and/or walk for two out of eight hours, for a maximum of 20 to 45 minutes at a time, and could sit for six out of eight hours, for a maximum of one hour at a time. The vocational expert testified that such a person could not perform any of Washington's past relevant work, at least two of which were defined as light-duty work, because the profile that the ALJ proposed was more consistent with sedentary work.

Yent stated that there would be a limited subset of sedentary positions that this person could perform. (Tr. 132). After the ALJ clarified that the person could sit for a maximum of one hour before needing a brief change of position, Yent testified that there would be unskilled or semi-skilled positions that the person could perform, such as telemarketer, which are available in the statewide and national economies in significant

numbers. (Tr. 133-34). He stated that another option for the claimant would be an entry-level dispatcher, with the available pool of jobs reduced by 50% to account for the environmental restrictions of the hypothetical. (Tr. 135). Finally, Yent stated that the hypothetical individual could work as an information clerk, with the job pool again reduced by 50%. (Tr. 136).

The vocational expert testified that most employers allow for missed attendance of about one day per month on average, and they accept that an employee might occasionally have an illness that lasts several days. (Tr. 137). Yent stated that a person who has chronic and repetitive attendance difficulties is not likely to keep a job. He testified that an employee normally gets two 15-minute breaks and a lunch break during a work day, and that the employer will tolerate a few extra minutes of downtime if the employee needs to use the restroom or get a drink of water, so long as the employee does not abuse it. (Tr. 138). He stated that an employee who has such debilitating pain or medication side effects that he cannot concentrate or needs to lie down, regardless of whether he has a doctor's excuse, so that he cannot work a full 40 hours per week, would not be able to hold a job and would be unemployable. (Tr. 138-39).

Upon cross-examination by plaintiff's attorney, Yent testified that none of the jobs he mentioned would likely require lifting 10 or 20 pounds above waist level, although he said he had allowed a 50% reduction in the availability of dispatcher and information

clerk jobs to account for that possibility. (Tr. 139). He stated that all three jobs are semi-skilled, but that a person should be able to learn any of them in 30 days or less. He said that a person with experience in the transportation industry would be familiar enough with the work of dispatchers to make the vocational accommodation reasonably within 30 days. Yent clarified that a person who had worked in the transportation industry would be familiar with the need for timetables, deadlines and schedules for the arrival of freight or passengers, not that the person would already have dispatching skills. He stated that such an individual should be able to make a vocational adjustment to being a dispatcher within 30 days. (Tr. 140-41).

The vocational expert testified that an individual's need to change positions very frequently, meaning more than three to four times per hour, would not be conducive to holding on to any of these jobs, and that no job would accommodate that high frequency of change. However, he said that, if the person is able to sit for several hours and then needs to stand up or down a couple of times, the person would probably accommodate well to the jobs that Yent named. (Tr. 141-42).

Plaintiff's attorney then added to the ALJ's original hypothetical that the claimant could only rarely use his neck to look down at a table or desk. Yent testified that such a person would not be able to work. (Tr. 142).

E.      Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 20-23, 24-27). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

F.      Plaintiff's Appeal

In his single assignment of error, Washington argues that the ALJ erred "by ignoring all of the written and testimonial evidence from Bert Bratton, M.D., the plaintiff's treating neurosurgeon, despite a previous Appeals Counsel [sic] order that Dr. Bratton's opinions are well supported" and that the ALJ's failure to weigh the medical evidence properly "resulted in a residual functional capacity that is not supported by the substantial credible evidence of record." Record Doc. No. 14, plaintiff's memorandum, at p. 2. Plaintiff argues that Dr. Bratton's written report and his testimony should be given controlling weight. He further contends that Dr. Bratton's opinions, even if not entitled to controlling weight, are well supported by clinical findings and are not inconsistent with the majority of the medical evidence.

Washington's argument fails for several reasons. First, the ALJ did not ignore Dr. Bratton's findings and opinions, as plaintiff contends. The ALJ reviewed Dr. Bratton's records and testimony. He relied on the entire medical record to find that Washington

has severe impairments consisting of status post-cervical discectomy and fusion in 2001, degenerative changes at L3-4 and L5-S1 of the lumbar spine and disc bulging at L5-S1.

Second, Dr. Bratton does not qualify as plaintiff's treating physician. A "treating" physician is one

> who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, <u>an ongoing treatment relationship</u> with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source <u>when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)</u>. We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. § 404.1502 (emphasis added).

The Fifth Circuit has held that a physician who examined a plaintiff only three times (two more times than the medical evidence establishes that Dr. Bratton examined Washington) for complaints of back pain and leg weakness is <u>not</u> a treating physician as defined by the Commissioner's regulations. Thus, the ALJ did not err by refusing to give that doctor's opinion the controlling weight accorded to a treating physician's opinion. <u>Hernandez v. Astrue</u>, 278 Fed. Appx. 333, 2008 WL 2037273, at *6 n.4 (5th Cir. May 13, 2008) (citing 20 C.F.R. § 404.1502).

Similarly, the ALJ in the instant case did not err by declining to afford controlling weight to Dr. Bratton's written opinion dated March 13, 2007 (Tr. 534-35), and his testimony. Dr. Bratton's sole progress note of plaintiff's visit to him on February 6, 2007, reflects that he did not perform a physical examination. He noted plaintiff's complaints, took a medical history, diagnosed plaintiff with status post cervical fusion and lumbar stenosis, recommended a cervical spine MRI and prescribed medication. (Tr. 532-33). On February 28, 2007, the Medical Center of Louisiana rejected Dr. Bratton's request to perform a cervical MRI because Dr. Bratton had no ordering privileges. (Tr. 536). Dr. Bratton's written report confirms that he "examined"Washington only once in this way.

Although Dr. Bratton testified that plaintiff can give him information or tell him if he needs more medication when they see each other at church and Bible study, the record contains no written documentation of how often they discussed plaintiff's medical issues, the content of any such communication, or that Dr. Bratton ever actually examined plaintiff or made any clinical findings when he saw plaintiff on such occasions. As in Hernandez, "the record is bereft of any specific facts regarding any medical treatment or diagnosis." Hernandez, 2008 WL 2037273, at *3. In these circumstances, Dr. Bratton does not qualify as a treating physician.

Moreover, Dr. Bratton's opinion that plaintiff is permanently and totally disabled from working is not a medical opinion entitled to any weight, but is a legal conclusion on an issue reserved to the Commissioner. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Tamez v. Sullivan, 888 F.2d 334, 336 n.1 (5th Cir. 1989).

In addition, Dr. Bratton's opinion concerning plaintiff's abilities is directly contradicted by the opinions of Dr. Gaines, who specializes in physical medicine and rehabilitation, and Dr. Mandich, an internist, both of whom actually examined plaintiff, as well as the opinions of two non-examining physicians who reviewed the medical records for the Commissioner on April 6, 2005 and August 3, 2007, (Tr. 434-41, 558-65), and the testimony of Dr. Amusa. All of these doctors concluded that plaintiff was capable of working within certain limitations. It is the ALJ's province to resolve conflicts in the evidence. Newton, 209 F.3d at 452. The ALJ in this case exhaustively reviewed the record. The residual functional capacity that he assessed includes the limitations found by Drs. Gaines and Amusa, and is substantially supported by their findings.

Accordingly, this assignment of error lacks merit.

<u>CONCLUSION</u>

The ALJ did not err by failing to grant Dr. Bratton's opinion controlling weight because Dr. Bratton was not a treating physician as defined by the Commissioner's regulations. Furthermore, substantial evidence supports the ALJ's findings concerning plaintiff's residual functional capacity.

**<u>RECOMMENDATION</u>**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  <u>Douglass v. United</u>

<u>Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this \_\_\_\_16th\_\_\_\_ day of November, 2009.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE